# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD TIMBERLAND, | 1:16-cv-00922-NONE-GSA-PC |
| Plaintiff, | **FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANT MASCARENAS' MOTION FOR SUMMARY JUDGMENT BE GRANTED (ECF No. 51.)** |
| vs. | |
| G. MASCARENAS, et al., | |
| Defendants. | **OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS** |

## I.     BACKGROUND

Ronald Timberland ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action pursuant to 42 U.S.C. § 1983. This action now proceeds with Plaintiff's Second Amended Complaint, filed on June 20, 2018, against defendant G. Mascarenas (Correctional Counselor I) ("Defendant") for failure to protect Plaintiff, in violation of the Eighth Amendment.[1]   (ECF No. 26.)

---

[1] On October 12, 2018, the court issued an order dismissing all other claims and defendants from this action, based on Plaintiff's failure to state a claim.   (ECF No. 30.)

On January 6, 2020, Defendant Mascarenas filed a motion for summary judgment on the grounds the following grounds: (1) there are no genuine issues of material fact in dispute and therefore, Defendant is entitled to judgment as a matter of law; and, (2) Defendant is entitled to qualified immunity.[2] (ECF No. 51.) On November 16, 2020, Plaintiff filed an opposition to the motion. (ECF No. 76.) On November 24, 2020, Defendant filed a reply to the opposition. (ECF No. 79.) The motion is deemed submitted. Local Rule 230(*l*).

For the reasons set forth below, the court recommends that Defendant's motion for summary judgment be granted.

## II.    SUMMARY OF PLAINTIFF'S ALLEGATIONS[3]

The events at issue in this case arose at Corcoran State Prison (CSP) in Corcoran, California, when Plaintiff was incarcerated there in the custody of the California Department of Corrections and Rehabilitation (CDCR). Defendant Mascarenas was an employee of the CDCR at CSP during the relevant time. Plaintiff's allegations follow.

### Background

On May 17, 2012, while at High Desert State Prison in Susanville, California, Plaintiff began serving a determinate Security Housing Unit (SHU) term of 48 months after being found guilty pursuant to a Rules Violation Report (RVR) for conspiracy to murder a peace officer. This RVR was based on information provided by a confidential informant.

On July 24, 2014, Plaintiff paroled to San Diego, California, having served his entire five-year sentence. Plaintiff's total SHU time served to that date was 26 months and 7 days.

///

---

[2] Concurrently with her motion for summary judgment, Defendant served Plaintiff with the requisite notice of the requirements for opposing the motion. Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998). (ECF No. 51-2.)

[3] Plaintiff's Second Amended Complaint is verified and his allegations constitute evidence where they are based on his personal knowledge of facts admissible in evidence. Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004). The summarization of Plaintiff's claim in this section should not be viewed by the parties as a ruling that the allegations are admissible. The court will address, to the extent necessary, the admissibility of Plaintiff's evidence in the sections which follow.

On August 21, 2014, Plaintiff was returned to custody on new charges. While awaiting the outcome of these charges Plaintiff was placed in the SHU as a Max Custody Inmate because he had paroled from the SHU. Plaintiff served another 6 months and 14 days in the SHU before being sentenced and returned to CDCR custody. Plaintiff's total SHU time served to that date was 32 months and 21 days.

Plaintiff returned to CDCR custody on March 5, 2015, at the California Institute for Men in Chino, California. Plaintiff was notified by the Prison Law Office in San Quentin, California that he was a member of "classes" in two cases, Coleman v. Brown, covering prisoners with mental health diagnoses, and Armstrong v. Brown, covering prisoners with physical disabilities under the ADA. Plaintiff was also notified that he qualified as a member of the Ashker v. Brown lawsuit, which brought to light the nefarious tactics used by the CDCR concerning SHU term sentences and releases, especially with regard to those prisoners who received SHU terms based on information provided by confidential informants. Plaintiff was also notified of the proposed settlement agreement in the Ashker litigation, in particular regarding determinate SHU terms: "All prisoners serving determinate SHU terms will serve 1/2 of the term specified. Parolees/violators returning to CDCR custody with new sentences shall not be returned to SHU to complete unexpired SHU term from previous prison term(s)." ECF No. 26 at 6 ¶ M.

**Classification Committee Hearing**

On April 1, 2015, Plaintiff returned to CSP SHU, Facility 4B. On May 5, 2015, Defendant, Plaintiff's assigned counselor, and committee members, held a hearing which resulted in Plaintiff being given another 26-month SHU term based on the RVR from 2012. As of the date of the hearing, Plaintiff had served a total of 34 months and 21 days in the SHU. This was well over the "1/2 time" to be served per the Ashker Settlement Agreement. ECF No. 26 at 6 ¶ N. As a result of this hearing Plaintiff served an additional 23 months and 21 days in the SHU. Upon his release from the SHU Plaintiff had served a total of 58 months and 12 days for a 48-month SHU term. This "extra" SHU time lasted 10 months and 12 days beyond the original 48-month SHU term for a total of 34 months and 12 days beyond the "1/2 time" that all other prisoners with SHU terms had served. ECF No. 26 at 7:7-11.

Plaintiff was deprived of privileges such as phone calls, contact and family visits, religious services, quarterly packages, work/job assignments and education classes and programs, denying Plaintiff of the opportunity to earn a minimum of 30 weeks of "Milestone Credits," which would reduce his prison term. ECF No. 26 at 7:17. Plaintiff also suffered reduced yard access, reduced time spent out of his cell, and reduced medical services.

Defendant G. Mascarenas, Plaintiff's assigned counselor, did not provide any notice to Plaintiff of the May 5, 2015, Institutional Classification Committee hearing, either before or after the hearing. Defendant Mascarenas also failed to provide Plaintiff with any written notice of conduct reports or charges against him. Plaintiff was denied an opportunity to attend the hearing, submit any evidence, call witnesses, or offer any defense to the allegations against him. At the hearing defendant Mascarenas presented committee members with many false statements, allegations, and outright lies, which were entered in Plaintiff's Central File via the Classification Committee Chrono (128-G).

Defendant D. Patterson, Plaintiff's assigned staff assistant for the May 5, 2015 hearing, also failed to provide Plaintiff any notice of the hearing or charges against him, or assistance to Plaintiff to defend against charges. Defendant Patterson did not even meet with Plaintiff before or after the hearing.

**Inmate Appeal**

On June 2, 2015, Plaintiff filed inmate appeal log no. CSPC-6-15-03064, complaining about the actions of the committee members and defendant Mascarenas who gave Plaintiff's Classification Committee Chrono to another inmate with instructions to "pass this around," which placed Plaintiff in extreme danger from other inmates. ECF No. 26 at 12:5-6. Plaintiff requested that the false "facts" be removed from his C-file. ECF No. 26 at 12:19-20. He also requested to be placed on permanent single-cell status and moved to the recently instituted Long Term Restricted Housing (LTRH) for those SHU inmates in the mental health program.

The actions of the committee members should have automatically warranted an investigation into staff misconduct as mentioned in CDCR's Code of Regulations governing "Inmate Appeals - Levels of Review and Disposition." ECF No. 26 at 9-10.

On June 12, 2015, at the first level of review, defendant A. Maxfield partially granted Plaintiff's request to be moved to the LTRH Unit, but denied the request for single-cell status. No mention of staff misconduct was made.

On July 6, 2015, at the second level of review, defendant M. Sexton again partially granted Plaintiff's request to be moved to the LTRH Unit, but denied the request for single-cell status. No mention of staff misconduct was made. There was an acknowledgement of "several errors documented on the 128-G dated May 5, 2015." ECF No. 26 at 10:18-20.

As defendants Maxfield and Sexton were both members of the committee whose actions the appeal was about, neither should have reviewed this appeal at any level of review. Both defendants effectively blocked any investigation into staff misconduct by fellow committee members. Despite the approval to be moved to the LTRH Unit rendered on June 12, 2015, Plaintiff was not actually moved until April 13, 2016.

**Plaintiff's 128-G Chrono**

On May 11, 2015, third watch floor officer M. Tabarez [not a defendant] slid an envelope under Plaintiff's cell door, stating, "Hey, the dude in cell #10 just gave this to me. He said a counselor gave it to him last week, at least he's giving it back." ECF No. 26 at 11:14-16. Upon opening the envelope and reading the enclosed document, Plaintiff realized that this was a 128-G committee chrono concerning a hearing which apparently occurred the previous week. The document contained many false statements about Plaintiff, particularly under the headings "Cell Review" and "Effective Communication." ECF No. 26 at 11:23-25.

On May 12, 2015, while outside in the recreation "cages," Plaintiff was able to question the inmate who resided in cell #10, known as "Baby Boy," a validated Crips gang member, and asked him about the 128-G form. ECF No. 26 at 11-12. Baby Boy stated, "Yeah, some female counselor gave that to me last week and told me to 'pass this around.' You shouldn't be working for the police and snitching on people." ECF No. 26 at 12:4-8. Plaintiff immediately realized that his status amongst the other inmates was in jeopardy by the reaction from them. Many of them made comments about "snitches being dead meat." ECF No. 26 at 12:10-13.

///

Between May 5, 2015 and May 11, 2015, defendant Mascarenas did knowingly place Plaintiff's safety in jeopardy by giving the 128-G form, which contained many false "facts" about Plaintiff, to another inmate with instructions to "pass it around," effectively labeling Plaintiff a "snitch" or "rat" to other inmates.  ECF No. 26 at 12:17-24.

For the remainder of the time that Plaintiff spent in the SHU he was under a constant and escalating barrage of written and verbal threats of violence and death from inmates in both the General Population (GP) and Sensitive Needs Yard (SNY).

Plaintiff suffered physical injury on numerous occasions - being spit on; being gassed, having feces, urine, or a mixture of both, thrown on him; and being the target of homemade darts and arrows using blowguns and bows, these being dipped in feces and/or urine, designed to cause illness and infection.  On one occasion a wheelchair-bound inmate squirted the contents of his colostomy bag on Plaintiff.

Plaintiff also suffered from anxiety, fear, nervousness, paranoia, deep depression, insomnia, weight loss and gain, loss of appetite, exhaustion, stress, suicidal thoughts, and various side effects from medications prescribed to help deal with these issues. Elavil, Trilipta1, Clonadine, Levothyroxine, and Abilify are but a few of the medications prescribed to Plaintiff. Upon Plaintiff's release from the SHU on April 26, 2017, he was informed that he could no longer be housed on any General Population yard due to confirmed death threats from other inmates.   These threats used the information provided on the 128-G dated April 29, 2015, printed and given to another inmate by defendant G. Mascarenas. Plaintiff has received numerous death threats from SNY prison gangs, Northern Riders, Independent Riders, and USA Skins.

Plaintiff has received RVRs and suffered loss of credits and various privileges due to his refusal to accept a cell mate. Plaintiff has been moved/transferred five times since his release from the SHU. He is currently awaiting transfer to another prison due to safety/enemy concerns.

**Relief**

Plaintiff requests monetary damages, including punitive damages, and injunctive relief.

///

///

### III.    SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment, and the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)). If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323). This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

In judging the evidence at the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

///

The court determines only whether there is a genuine issue for trial. Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

In arriving at these findings and recommendations, the court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this court did not consider the argument, document, paper, or objection. This court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## IV.   PLAINTIFF'S EIGHTH AMENDMENT FAILURE TO PROTECT CLAIM

Plaintiff brings a claim against defendant G. Mascarenas (Correctional Counselor I) for failure to protect Plaintiff, in violation of the Eighth Amendment.

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006). Although prison conditions may be restrictive and harsh, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety. Farmer v. Brennan, 511 U.S. 825, 832-33 (1994) (internal citations and quotations omitted). Prison officials have a duty to take reasonable steps to protect inmates from physical abuse. Farmer, 511 U.S. at 833; Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005). The failure of prison officials to protect inmates from attacks by other inmates may rise to the level of an Eighth Amendment violation where prison officials know of and disregard a substantial risk of serious harm to the plaintiff. E.g., Farmer, 511 U.S. at 847; Hearns, 413 F.3d at 1040.

To establish a violation of this duty, the prisoner must establish that prison officials were "deliberately indifferent to a serious threat to the inmate's safety." Farmer, 511 U.S. at 834. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently "substantial risk of serious harm" to his future health. Id. at 843 (citing Helling v. McKinney, 509 U.S. 25, 35 (1993)). The Supreme Court has explained that "deliberate indifference entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge

that harm will result." Farmer, 511 U.S. at 835. The Court defined this "deliberate indifference" standard as equal to "recklessness," in which "a person disregards a risk of harm of which he is aware." Id. at 836-37.

The deliberate indifference standard involves both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." Id. at 834. Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate health or safety." Id. at 837; Anderson v. County of Kern, 45 F.3d 1310, 1313 (9th Cir. 1995). To prove knowledge of the risk, however, the prisoner may rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish knowledge. Farmer, 511 U.S. at 842; Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).

## V. DEFENDANT'S UNDISPUTED FACTS (DUF)[4]

Defendant Mascarenas submitted the following facts in support of her motion for summary judgment. (ECF No. 51-3.)

### A. Parties.

1. At all times relevant to this action, Plaintiff Ronald Timberland (T-20871) was in the custody of the California Department of Corrections and Rehabilitation (CDCR) and confined in the Security Housing Unit at California State Prison – Corcoran (COR). (ECF No. 27, ¶ D; Defendant's Exhibit A (DX A), Attachment 1, Decl. of B. Hancock and documents from Timberland's central file, p. 5-6.)

2. Defendant G. Mascarenas was employed by CDCR, and worked at COR as a Correctional Counselor I. (ECF No. 27, ¶ E.) In that position, Defendant Mascarenas would formulate inmate case information and present that

---

[4] Plaintiff failed to properly address Defendant's statement of undisputed facts as required by Local Rule 260(b). Accordingly, the court may consider Defendant's assertions of fact as undisputed for purposes of this motion. Id; Fed. R. Civ. P. 56(e)(2). However, in light of the Ninth Circuit's directive that a document filed pro se is "to be liberally construed," Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, and Rule 8(e) of the Federal Rules of Civil Procedure providing that "[p]leadings shall be construed so as to do justice," see Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007), the court shall strive to resolve this motion for summary judgment on the merits.

information, and proposed Committee action, to the Classification Committee for final review and approval during the inmate's classification hearing. (Defendant's Exhibit B (DX B), Decl. of G. Mascarenas, ¶ 2.)

3.     Before presenting the information to the Classification Committee, Defendant Mascarenas reviewed all case information that was available to her, including the inmate's central file, all confidential information, and the inmate's Strategic Offender Management (SOMS) file. (DX B, ¶ 3.)

4.     Timberland claims that he has never met Defendant Mascarenas. (Defendant's Exhibit C (DX C), deposition transcript of Ronald Timberland taken September 25, 2019, at 21:11-13.)

**B.     Background**

5.     Timberland was returned to the custody of CDCR on July 15, 2014. (DX A, p. 6.)

6.     On March 5, 2015, Timberland was placed into administrative segregation at the California Institution for Men (CIM). (DX A, p. 16-17.)

7.     A computer check revealed that Timberland had been paroled with an unexpired SHU term for conspiracy to murder a peace officer. (DX A, p. 16.) Timberland was deemed a threat to the safety and security of the institution, and he remained in administrative segregation pending transfer. (*Id.*)

8.     Timberland arrived at COR on April 1, 2015, and was placed into the Security Housing Unit. (DX A, p. 5.)

**C.     Timberland's Initial Classification Hearing**

9.     On May 1, 2015, Defendant Mascarenas advised Timberland that he would appear before the Institutional Classification Committee on May 5, 2015. (DX A, p. 20-21.) The notification allowed Timberland to determine if there were any issues he wanted to discuss with the Committee. (DX B, ¶ 7.) Inmate Timberland refused to attend the hearing, therefore it was held in absentia. (DX A, p. DX B, ¶ 7.)

10. Defendant Mascarenas was not inmate Timberland's assigned counselor, but was asked to assist Timberland's assigned counselor, V. Plata, who had a very heavy caseload. (DX B, ¶ 6.)

11. After reviewing all of Timberland's case information, but prior to the Committee hearing, Counselor Mascarenas documented the information on a CDCR Form 128-G prior to the Committee hearing. (DX B, ¶ 4.)

12. During the Committee hearing, Counselor Mascarenas presented the information, which was reviewed by the entire Committee. (*Id.*)

13. Timberland's Classification Committee hearing was held on May 5, 2015. (DX B, ¶ 5.) As a Correctional Counselor, Mascarenas was not a member of the Committee. (*Id.*) The members of inmate Timberland's Initial Classification Committee included Sergeant M. Cuevas; Officer J. Pierce from the Institutional Gang Investigations (IGI) Unit; D. Tepperman, a Licensed Clinical Social Worker (LCSW); Correctional Counselor II Maxfield, who acted as the Recorder; and Chief Deputy Warden Sexton. (DX A, p. 23; *Id.*)

14. On the Form 128-G, Counselor Mascarenas noted under "Committee Comments" that Timberland "was housed on a Sensitive Needs Yard (SNY) facility from 2002 to 2005. Per 128B 3/11/15, S states he is general population and his safety needs were exclusive to High Desert State Prison (HDSP). ICC action dated 3/11/15, does not address prior SNY placement and there is no current documentation since current term documentation if S is still requesting SNY placement." (DX A, p. 22.)

15. The information contained in the 128-G regarding inmate Timberland's history on the Sensitive Needs Yard (SNY) was accurate information that Counselor Mascarenas obtained from Timberland's central file. (DX B, ¶ 8.)

16. There are several documents in Timberland's central file, including Inmate Segregation Profiles dated January 11, 2014, June 18, 2014, July 14, 2014, and

March 5, 2015, that all document Timberland's desire to be housed on an SNY, or his placement on an SNY. (DX A, p. 8-11.)

17.   Because Timberland did not attend his Institutional Classification Committee hearing, he could not advise the Committee of any inaccuracies in the Form 128-G. (DX B, ¶ 10.)

18.   Based on the information provided to the Committee, they elected to retain Timberland on single cell status until his housing cell status could be further reviewed, and he could be returned to the ICC to address his cell placement. (DX A, p. 22.)

**D.   Timberland's Grievance**

19.   On June 2, 2015, Timberland filed a grievance claiming that he had received a copy of his classification chrono through the institutional mail on May 11, 2015. (DX A, p. 24-25.) Timberland claimed that Correctional Counselor Patterson had made "fraudulent" statements on the chrono, including that Timberland wore hearing aids, and that he was housed on the SNY. (DX A, p. 25.) According to Timberland, in July 2013 he had told Sergeant Lopez that he was rescinding his SNY status. (DX A, p. 25.)

20.   Timberland claimed that the information regarding SNY would place him at a "greater risk of injury/death." (DX A, p. 24.)

21.   Timberland requested that he be placed on permanent single cell status, and that he remain in the SHU for the remainder of his term of imprisonment. (DX A, p. 24-25.)

22.   On June 12, 2015, Timberland's grievance was answered at the first level of review by Correctional Counselor II Maxwell. (DX A, p. 31-32.) The answer noted that there were several errors in the 128-G, and that Timberland would be scheduled for another ICC hearing to correct those errors. (*Id.*)

23.   Dissatisfied with the response, Timberland elevated the grievance to the second level of review on July 1, 2015. (DX A, p. 26-27.) For the first time Timberland

claimed that he was receiving death threats from both general population and SNY inmates, even though he was housed in the SHU where inmates are confined to their cells, and not allowed on either the general population or SNY. (DX A, p. 26; DX B, ¶ 14.)

24. Timberland again claimed that he had received his classification chrono through the institutional mail, but this time noted that the chrono had been mistakenly given to the inmate in cell 10, who passed the chrono around the unit. (DX A, p. 27.) Timberland again blamed CCI Patterson. (DX A, p. 27.)

25. Timberland received the second level response on July 6, 2015. (DX A, p. 33.) Again, Timberland's request for single cell status was denied. (DX A, p. 33-34.)

**E.     Timberland's Inmate Segregation Record**

26. Timberland later claimed that he spoke with "Baby Boy," the inmate who mistakenly received the chrono, while out on the yard on May 11, 2015. (ECF No. 27, § R.)

27. According to Timberland, "Baby Boy" identified the person who gave him the chrono as a "female counselor." (*Id*.) Timberland admits that there are several female counselors. (DX C, at 39:16-20.) Timberland now claims that because Defendant Mascarenas' name was on the chrono, he assumed that she was the Counselor who gave it to the other inmate. (DX C, at 39:4-7.)

28. Timberland's segregation record shows that he did not go out to the yard between April 23, 2015 and July 28, 2015. (DX A, p. 38-47.)

**F.     Counselor Mascarenas' Procedures**

29. During her time as a Correctional Counselor I in the Security Housing Unit, it was Counselor Mascarenas' custom and practice to provide an inmate with a copy of the CDCR Form 128-G only if the chrono was requested by the inmate. (DX B, ¶ 12.) She did not send the inmate's 128-G through institutional mail. (DX B, ¶ 13.)

30. Because the inmates in the Security Housing Unit (SHU) are confined to their cells, they cannot come to Counselor Mascarenas' office to request a copy of the

128-G. (DX B, ¶ 14.) Inmates would request a copy of the 128-G at the completion of Committee, or if they saw Counselor Mascarenas in the housing unit and called me over to their cell. (*Id.*) Because Inmate Timberland was not present during his ICC hearing held May 5, 2015, he did not request a copy of his 128-G at the hearing. (DX B, ¶ 14.)

31.   Because she was not inmate Timberland's assigned counselor, Counselor Mascarenas did not work in his building, therefore, Counselor Mascarenas was not present in the housing unit for inmate Timberland to request that she provide him with a copy of his 128-G. (DX B, ¶ 15.)

32.   Counselor Mascarenas did not receive a request for inmate Timberland for a copy of his 128-G, and therefore, as was her practice, she did not provide inmate Timberland with a copy that document. (DX B, ¶ 16.)

33.   Counselor Mascarenas did not give any other inmate a copy of inmate Timberland's 128-G. (DX B, ¶ 17.)

## VI.   DEFENDANT MASCARENAS' ARGUMENTS

Defendant Mascarenas argues that she did not violate Plaintiff's Eighth Amendment rights by failing to protect him from harm. Defendant's evidence includes Plaintiff's allegations in the Second Amended Complaint; the declarations of B. Hancock (Custodian of Records) and defendant G. Mascarenas (Correctional Counselor); selected testimony from Plaintiff Ronald Timberland's deposition taken on September 25, 2019; Plaintiff's prison appeal log no. CSPC-6-03064; and documents from Plaintiff's prison central file.

### A.   Plaintiff Cannot Show that Defendant Mascarenas Personally Participated in Giving Plaintiff's Chrono to Another Inmate

First, Defendant argues that Plaintiff cannot establish that defendant Mascarenas personally participated in the alleged constitutional violation against Plaintiff. In the Second Amended Complaint, Plaintiff alleges that defendant Mascarenas gave another inmate Plaintiff's 128-G classification chrono, but Plaintiff bases this allegation solely on the facts that Mascarenas' name is on the chrono and the inmate told Plaintiff that a "female counselor" gave

him the chrono.  Plaintiff admits that there is more than one female counselor at CSP and he never met Mascarenas.  Defendant Mascarenas explains that she was not Plaintiff's assigned counselor and did not work in Plaintiff's building.  Counselor Mascarenas prepared the 128-G chrono before the committee hearing and presented the information at Plaintiff's classification committee hearing on May 5, 2015.  However, Plaintiff did not request a copy of the 128-G chrono, and Counselor Mascarenas did not provide a copy to Plaintiff or any other inmate. Plaintiff fails to offer any evidence to support his conclusory allegations, that if proven would show Mascarenas' personal involvement in an Eighth Amendment violation.

**B.** **Defendant Mascarenas was not Deliberately Indifferent to a Known Risk of Harm, and Plaintiff has no Personal Knowledge or Evidence to the Contrary**

Second, Defendant argues that defendant Mascarenas was not deliberately indifferent to a known risk of harm to Plaintiff, and Plaintiff has no evidence to the contrary.  In the Second Amended Complaint, Plaintiff alleges that his assigned Correctional Counselor, defendant Mascarenas, put false information on Plaintiff's chrono, stating that Plaintiff has previously been housed on a Sensitive Needs Yard (SNY).  Because of the false information, Plaintiff claims that he was labeled a "snitch" and physically and emotionally assaulted by other inmates.  But Counselor Mascarenas reviewed the confidential section of Plaintiff's central file and found information indicating that Plaintiff sought placement in the SNY while at High Desert State Prison, and Mascarenas properly documented this information on the 128-G chrono.  Moreover, Plaintiff's grievance states that the chrono was accidentally provided to another inmate, and was not done intentionally.   Defendant concludes that for these reasons, Plaintiff's Eighth Amendment claim fails.

**1.** **Plaintiff was not housed under conditions posing a substantial risk of harm**

On June 2, 2015, Plaintiff submitted a grievance claiming that he received his classification chrono through institutional mail.  Plaintiff alleged that the chrono contained errors, including that he had been housed on SNY between 2002 and 2005.  Plaintiff claimed that he had rescinded his SNY status in 2013.  In the grievance, Plaintiff requested single cell status,

claiming the erroneous information placed him at a "greater risk of injury or death." However, Plaintiff did not claim in the grievance that he had been assaulted by other inmates.

In the Second Amended Complaint, Plaintiff claims that he was assaulted by other inmates while participating in yard, but Plaintiff's segregation record shows that he refused to go to yard during this time period. Moreover, as indicated by the classification committee, Plaintiff was being retained on single cell status until the issue of Plaintiff's SNY status could be investigated. Defendant argues that the undisputed evidence establishes that Plaintiff was housed under conditions meant to reinforce his need for safety, rather than under conditions posing an excessive risk to Plaintiff's safety.

### 2.   Defendant Mascarenas was not Deliberately Indifferent to Plaintiff's Safety

Defendant Mascarenas shows evidence that she did not label Plaintiff a "snitch" or spread a rumor that put Plaintiff at risk of assault by other inmates. Plaintiff's form 128-G chrono made no reference to any such information. Instead, defendant Mascarenas wrote that Plaintiff was housed on the SNY before his release on parole, a fact that is recorded on several documents contained in Plaintiff's central file. This statement does not suggest in any way that Plaintiff has acted as a "snitch."

Plaintiff has not alleged facts that defendant Mascarenas was personally aware of any risk of harm against him. Nor has Plaintiff shown that he was under any specific risk of harm after his initial classification committee hearing. Although Plaintiff may have been afraid, he lacks evidence that defendant Mascarenas knew about any specific ongoing threat to his safety and did nothing about it. Under these facts, Plaintiff has not shown that defendant Mascarenas failed to protect him in violation of the Eighth Amendment.

### C.   Defendant has Met her Burden

Based on Defendant's arguments and evidence, the court finds that Defendant has met her burden of demonstrating that she did not act with deliberate indifference to a substantial risk of serious harm to Plaintiff. Therefore, the burden now shifts to Plaintiff to produce evidence of a genuine material fact in dispute that would affect the final determination in this case.

## VII.   PLAINTIFF'S STATEMENT OF FACTS (SOF)[5]

Plaintiff submitted the following facts in support of his opposition to Defendant's motion for summary judgment.   (ECF No. 76 at 5-6.)[6]

1.   Plaintiff is a state prisoner.  On September 13, 2912, while at High Desert State Prison (HDSP), Plaintiff was transferred to California State Prison – Corcoran, Security Housing Unit, to serve a 48 month SHU term.

2.   Plaintiff was paroled from Donovan State Prison – San Diego on July 24, 2014. Plaintiff was returned to custody on March 5, 2015 to California Institute of Men – Chino (CIM).  While there, it was decided for Plaintiff to return to Corcoran– SHU to resume serving the remainder of his SHU term.

3.   Plaintiff was transferred to Corcoran-SHU on April 1, 2015, to complete his SHU term.  On May 5, 2015, an Institutional Classification Committee (ICC) hearing was held.  Being that Plaintiff had no prior notification of this hearing, it was held in absentia.

4.   It was at this hearing that Defendant introduced/presented false information about Plaintiff to Committee Members.  This false information, now entered into Plaintiff's Central File (C-File), was then printed out on a Form 128-G Classification Chrono.

5.   This chrono was later hand delivered to another inmate with verbal instruction(s) to "pass it around" by a staff member who was later identified by two (2) Housing Unit Officers, the officer who worked in the Housing Unit Tower, as well as the inmate who was given the Chrono, as Defendant, Counselor G. Mascarenas.

///

---

[5] The facts reproduced here are from Plaintiff's Statement of Facts. (ECF No. 76 at 5-6.)  Plaintiff has not submitted an appropriate Statement of Undisputed Facts, as required by Local Rule 260(b).  However, as indicated above at fn.3, the court shall strive to resolve Defendant's motion for summary judgment on the merits.

[6] All page numbers cited herein are those assigned by the court's CM/ECF system and are not based on the parties' pagination of their briefing materials.

6.      This document was then passed around the whole Housing Unit, to all white G.P. inmates.  From that time until the present, Plaintiff has suffered various forms of physical assaults, verbal abuses, as well as both physical and psychological injury.

7.      Plaintiff did file a CDCR Form 602 Inmate Appeal Grievance Form on June 2, 2015. This appeal was "denied" at all three levels of response.

## VIII.   PLAINTIFF'S ARGUMENTS

Plaintiff argues that Defendant G. Mascarenas failed to protect Plaintiff from harm, in violation of the Eighth Amendment.  Plaintiff's evidence includes Plaintiff's allegations in the Second Amended Complaint; the Notice of Classification Hearing dated April 29, 2015; Plaintiff's 602 Inmate Appeal Grievance log number CSPC-6-15-3064, filed on June 2, 2015; Classification Committee Chronos; Plaintiff's Declarations; Correspondence; and documents from Plaintiff's prison central file.

### A.      Plaintiff did not receive prior notice of ICC Hearing from Defendant G. Mascarenas, his assigned CCI

Plaintiff argues that he did not receive prior notice of the May 5, 2015 ICC Hearing from Defendant Mascarenas.   In support of this argument, Plaintiff refers to the Notice of Classification Hearing dated April 29, 2015, which was filed as Exhibit A in Defendant Mascarenas' Statement of Undisputed Facts and shows that none of the boxes normally attributed to the inmate in question are marked --"Inmate waives right to appear in person;" and "Inmate waives right to 72 hour notification" – and Plaintiff's signature is missing.

Plaintiff also alleges in the Second Amended Complaint that a female staff member came to his cell door who he mistakenly thought was a psych-tech, and Plaintiff told her, "I'm fine and didn't need to see anyone," after which she responded, "Oh, yeah?" and walked away.  The form dated April 29, 2015, a full 48 hours before the Committee Hearing, gives the appearance that a conversation had taken place, but Plaintiff states that there was never any mention of an upcoming Committee Hearing.

///

///

**B.    Defendant presented false facts to Committee members and on the CDCR Form 128-G about Plaintiff**

Plaintiff argues that Defendant Mascarenas presented false facts to the Committee members and on the Form 128-G about Plaintiff. In support of this argument, Plaintiff states that Defendant admits in Defendant's Statement of Undisputed Facts (SUF), that she was the CCI who presented the information at Timberland's initial SHU Classification Committee Hearing held on May 5, 2015. In another of Defendant's DUFs, Defendant states that the information on the 128-G form regarding Timberlake's history on the SNY is accurate information that she obtained from Plaintiff's central file.

But Plaintiff notes the following:

1)    ICC notes state that Plaintiff was on SNY status prior to parole. Plaintiff was formerly on SNY status from 2002-2005, but on March 11, 2015, form 128-B, Plaintiff states that he is G.P. Plaintiff argues that the ICC action on March 11, 2015 does not address his prior SNY placement and there is no current documentation since he is still requesting SNY placement. ICC elects to place Plaintiff on single cell status pending review.

2)    While Defendant Mascarenas insists the information is accurate information obtained from Plaintiff's Central File, none of the other documents, exhibits, or statements mention that Plaintiff was "SNY from 2002-2005."

3)    Three of Defendant's documents in the DUF – Inmate Segregation Profile dated 9/13/12, 7/7/14, and 3/5/15 – show under the heading "Safety Concerns": "9-13-12 CSP-COR wants SNY." The 9-13-12 document should have said Plaintiff "wants information about SNY." Plaintiff did ask the R&R Officer for information about SNY status when he arrived at CSP-COR SHU on 9-13-12.

4)    Plaintiff did not accept SNY status until April 26, 2017 when at ICC, committee members notified him that "You can no longer be housed on a G.P. yard, due to confirmed death threats from STG Aryan Brotherhood and their sympathizers. Plaintiff's SMF, exhibits.

5)    The threats only came about as a direct result of Defendant Mascarenas' actions printing false facts on the 128-G form and giving this to another inmate to "pass around."

6)     Defendant states on DUF #15 that she reviewed the confidential section of plaintiff's central file and found information indicating that plaintiff sought placement on SNY while housed at High Desert State Prion and properly documented this information on the Form 128-G.   Yet Defendant provides documentation which clearly shows that plaintiff "arrived/received from another facility at HDSP on April 17, 2012" and "transferred to another facility – CSP-COR) on September 13, 2012" (DMPA, Ex. A, External Movements Summary, pg. 205 or 786.)  If it were true that plaintiff sought SNY placement while at HDSP, it would have occurred during those dates in 2012, not from 2002-2005 as she presented on the 128-G.

### C.     Defendant G. Mascarenas Personally Participated in giving Plaintiff's 128-G Chrono to another inmate

Plaintiff argues that Defendant Mascarenas personally participated in giving Plaintiff's 128-G chrono to another inmate.  In support of this argument, Plaintiff notes:

On May 11, 2015, plaintiff received his copy of ICC chrono 128-G dated April 29, 2015 and May 5, 2015 from 3rd watch Floor Officer Tabarez who stated: "I just got this from the guy in cell 110.  He said a female counselor gave it to him last week, at least he gave it back."

While at yard the next day, Plaintiff talked to the inmate in cell 110, known as "Baby Boy," who stated, "Yeah, some female counselor gave that to me last week and told me to pass it around.  You shouldn't be working for the police and snitching on people." (P's SMF, Ex.)

Defendant explains that she was not plaintiff's assigned counselor and did not work in Plaintiff's building.  (DUF #29.)  Defendant's custom was to provide an inmate with a copy of the 128-G only if the chrono was requested by the inmate.  (Id.)  She did not send the inmate's chrono 128-G through institutional mail.  (Id.)  CCI Mascarenas did not receive a request from inmate Timberland for a copy of his 128-G, so she did not provide one.  (DUF #32.)

Plaintiff agrees that he was not present at the hearing on May 5, 2015, and did not request a copy of his 128-G, as he was not aware of its existence, nor that a hearing was held until he received the copy from Officer Tabarez on May 11, 2015.

///

///

Plaintiff argues that there are discrepancies in Defendant's own statements:

1)   Defendant would have <u>had</u> to be present in Plaintiff's housing unit if it were true that she gave notice of the hearing to plaintiff on May 1, 2015.

2)   If Defendant did not utilize institutional mail to provide requested copies of 128-Gs, the only means left is to do so in person.

In the video deposition conducted by Defendant's counsel on September 25, 2019, while Plaintiff was residing at CCI-Tehachapi, counsel revealed that he [Plaintiff] had declarations from 2nd and 3rd watch Floor Officers Tabarez, Aldaco, the Town Officer Malin, and inmate "Baby Boy," who all identified Defendant Mascarenas as the counselor who gave the 128-G to the inmate residing in cell 110, Baby Boy. Plaintiff explained that during one of his many transfers since being released from the SHU on April 26, 2017, the box of property that contained the declarations, as well as other legal documents, research papers, and copies pertaining to this case, was lost in transit. Plaintiff further explained that he was having great difficulty receiving requested information as to where these officers were now employed, and information about Baby Boy, if he was still an inmate and where he is housed. These requests were denied as having safety and security issues. Plaintiff believes that this conversation was on the record.

Off the record was a conversation wherein Plaintiff asked about the discovery request he had submitted and had not received any responses. Several times Plaintiff requested a copy of the transcript from the video deposition, along with Trust Withdrawals requests to cover the cost of copies, even with no funds in his account. To date, Plaintiff has received nothing in this regard. Plaintiff will address this situation by a separate motion to expand discovery.

**D.**   **<u>Defendant G. Mascarenas was Deliberately Indifferent to the Known Risk of Harm to Plaintiff</u>**

Plaintiff argues that Defendant Mascarenas was deliberately indifferent to the known risk of harm to Plaintiff. In support of this argument, Plaintiff offers the following:

Defendant admits that she "received training in the safety and protection of prisoners during my time at the academy in 1999, and has received annual training on the subject every year since I graduated from the academy. In addition, while working for CDCR, I have received

21

on the job training dealing with the protection of staff, inmates, and the institution." (Defendant's Response to Interrogatory No. 3.)

Defendant admits that "the General Population inmates and inmates on the SNY are kept separated for the safety and security of the institution." (Defendant's Response to Request for Admission No. 1.)

It was common knowledge among inmates and staff members alike that General Population inmates viewed SNY inmates, formerly known as "PC's" (Protective Custody) as child molesters, rapists, snitches or rats, inmate copy or task force and as such, they targeted SNY inmates for assault and/or death.

General Population inmates were also of the opinion that it was a practice of CDCR to place those SNY inmates who agreed to on G.P. yards, to work as undercover agents or confidential informants, in order to gather evidence of crimes committed or going to be committed, and then "debrief" to CDCR officials who then used this information in the process known as "validating" – gang members would then be given indeterminate SHU terms while also facing possible prosecution for those crimes committed.

Among G.P. inmates, there was also the knowledge that some staff members would use a practice known as "smutting up" an inmate. The usual means would be to file false information and enter this false information into that inmate's personal central file.

Another way to use one inmate against another would be to let slip some damaging information about an inmate or group of inmates, thereby putting that inmate or group of inmates at risk of being assaulted or killed.

Crime reports and publications[7] are available to anyone with a desire to understand, along with reports about High Desert State Prison and CCI-Tehachapi that recognize these various ways that certain CDCR staff utilize to place inmates in positions to be subjected to acts of violence, assault, and death.

///

---

[7] Here, Plaintiff inserted a list of publications and news sources.

Plaintiff's charge that resulted in his SHU term, Conspiracy to Murder a Peace Officer, immediately placed him in a position of constant reprisal from those CDCR staff members who chose to engage in these actions with impunity. Even though the charge was untrue, Plaintiff could understand the situation for what it was. Plaintiff's attitude at that time was to "take his lumps," as these actions involved no other inmates and were directed only at him, with no physical injuries involved. Plaintiff may have suffered smaller food portions, too small or large laundry, short sheets, towels with holes, missed showers or yard. These would eventually cease, as staff members would see how Plaintiff would not react.

From 2012 to 2017, Plaintiff understood that the environment at COR SHU included many unprecedented events underway, especially during the dates mentioned in his complaint, April 2015 through April 2016. During that period of Plaintiff's confinement, both G.P. and SNY inmates were often housed at the same housing units, but in separate cells. This provided ample opportunity for those inmates who decided to participate in such behavior, to "gas," "spear," use homemade bows and arrows, and spit upon other inmates, such as Plaintiff, usually when outside of the cells, going to medical, going to yard, or going to various appointments.

Correctional Officers were also subjected to these kinds of assaults and suffered physical injuries as well. During this period, inmates of both designations would often use homemade hand-cuff keys to escape their cuffs and assault other inmates, as well as staff/officers of CDCR. Those same opportunities were available for participating inmates who chose to utilize yard privileges, those cell-sized cages inmates commonly refer to as "Kennels." These violent and dangerous surroundings were at that time commonplace. It should also be noted that this was taking place shortly after the statewide hunger strikes that all G.P. inmates were required to participate in, per instructions from inmate "shot callers," those inmates involved in prison politics who directed other inmates to act as required to stay in good standing with other inmates.

Until the 128-G containing the false and highly incendiary information was passed around, Plaintiff had been in good standing with the other G.P. inmates and had participated in both of the statewide hunger strikes, the latter in 2013 before his parole in 2014.

///

The types of actions described above would later provide the impetus for CDCR officials to institute various statewide changes in policy and procedures affecting SHU programs at various prisons, including CSP-Corcoran.   There were changes in the process known as "validating," which was used to identify various inmates as members of any particular prison gangs, and the newly-named "Security Threat Groups," especially the use of confidential informants and their "information."   Included in these changes was the way those inmates identified as having mental health issues and/or diagnoses would be housed, especially while in the ASU or SHU.   By the time plaintiff arrived back at CSP-COR on April 1, 2015, both the short-term and long-term Restricted Housing Programs had been instituted.   These various changes were not implemented, however, until after the Mental Health Department and SHU Programs were placed under Federal Receivership by federal courts who recognized the various violations of inmates' federally protected rights on a daily basis.

## IX.   ANALYSIS

To prove Plaintiff's claim that defendant Mascarenas failed to protect Plaintiff in violation of the Eighth Amendment, Plaintiff must provide evidence that Defendant, acting with deliberate indifference, exposed him to a substantial risk of serious harm to his future health. Farmer, 511 U.S. at 843 (citing Helling, 509 U.S. at 35).   The deliberate indifference standard involves both an objective and a subjective prong.   First, the alleged deprivation must be, in objective terms, "sufficiently serious."   Id. at 834.   Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate health or safety."   Id. at 837; Anderson, 45 F.3d at 1313.

### A.   Sufficiently Serious Deprivation

Extreme deprivations are required to make out a conditions of confinement claim, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.   Farmer, 511 U.S. at 834; Hudson v. McMillian, 503 U.S. 1, 9 (1992).   The circumstances, nature, and duration of the deprivations are critical in determining whether the conditions complained of are grave enough to form the basis of a viable Eighth Amendment claim.   Johnson v. Lewis, 217 F.3d 726, 731

(9th Cir. 2000). To support a failure to protect claim, a plaintiff first must "'objectively show that he was deprived of something "sufficiently serious".'" Lemire v. Cal. Dep't of Corrections & Rehabilitation, 726 F.3d 1062, 1074 (9th Cir. 2013) (quoting Foster v. Runnels, 554 F.3d 807, 812 (9th Cir. 2009); Farmer, 511 U.S. at 834). For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. See Helling, 509 U.S. at 35.

The Ninth Circuit has recognized that deliberately spreading a rumor that a prisoner is a snitch may state a claim for violation of the right to be protected from violence while in state custody. Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989). A plaintiff need not show that he was actually threatened or physically injured by inmates on account of being labeled a "snitch." Id. at 1139. The Supreme Court has rejected the notion that the Eighth Amendment does not reach official conduct that "is sure or very likely to cause" serious injury at the hands of other inmates. Helling v. McKinney, 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Moreover, an inmate does not have to wait until he is actually assaulted before obtaining relief. Ramos v. Lamm, 639 F.2d 559, 572 (10th Cir. 1980).

**Discussion**

In the Second Amended Complaint, Plaintiff alleges that he suffered physical injury and emotional distress because of false information written in his Classification Chrono.

> "Plaintiff suffered physical injury on numerous occasions - being spit on; being 'gassed,' the practice of throwing feces, urine or a mixture of both, on him; and being the target of homemade 'darts' and 'arrows' using blowguns and bows, these being 'dipped' in feces and or urine designed to cause illness and infection.
>
> . . . Upon plaintiff's release from the SHU on April 26, 2017, he was informed that he could no longer be housed on any G.P. yard, due to confirmed death threats from other inmates."

(Second Amended Complaint (SAC), ECF No. 26 at 14-15.)

///

///

25

Plaintiff also declared under penalty of perjury:

"A white inmate unknown to me, in a wheelchair cage next to mine attempted to 'spray' me with the contents of his colonoscopy bag utilizing the attached hose. Some of the contents did splash on my legs, shoes, hands and face, My jumpsuit was soaked. I immediately ran to the sink and attempted to rinse myself off. I also puked up my breakfast and continued to retch as the stench was so overpowering I could not breathe . . . The inmate called to me, 'Hey you snitching asshole, there's some shit for a piece of shit. Your counselor gave you up, fuckboy. That's what you get for working with the cops?'" (Pltf's Decl. ECF No. 76 at 60.)

In addition, Plaintiff discusses how damaging information can spread from one inmate to another in prison placing inmates in danger of assault, usually when they are outside of cells, going to medical, going to yard, or going to various appointments. (ECF No. 76 at 16.) Defendant has admitted that "the General Population inmates and inmates on the SNY are kept separated for the safety and security of the institution." (Deft's response to Pltf's Request for Admission #1.)

Defendant argues that Plaintiff was not at substantial risk of harm because Plaintiff "claimed that he was receiving death threats from both general population and SNY inmates, even though he was housed in the SHU where inmates are confined to their cells and not allowed on either the general population or SNY." (DUF #23.) Defendant also provides evidence that Plaintiff refused to go out to yard after the May 15, 2015 hearing, whereas Plaintiff's provides evidence of his personal experience being harassed and assaulted by other inmates.

Even assuming without deciding that the parties' dispute poses a triable issued of fact, the court finds that Plaintiff's failure to satisfy the remaining elements of a failure-to-protect claim, discussed below, entitle Defendant to summary judgment.

**B.    Personal Participation**

Under section 1983, Plaintiff must demonstrate that each defendant *personally* participated in the deprivation of his rights. Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002)

(emphasis added).  Plaintiff must demonstrate that Defendant Mascarenas, through her own individual actions, violated Plaintiff's constitutional rights.  Ashcroft v. Iqbal, 556 U.S. 662, 676-77 (2009).

Here, Plaintiff has not proven that that defendant Counselor Mascarenas personally participated in the alleged conduct that violated Plaintiff's rights.

The parties do not dispute the following:  During the relevant time period, Plaintiff was a state prisoner incarcerated at Corcoran State Prison (CSP) and defendant Mascarenas was employed there as a correctional counselor.  (DUF #1, 2; ECF No. 27, ¶ D; Deft's Exhibit A (DX A), Attachment 1, Decl. of B. Hancock and documents from Timberland's central file, p. 5-6; ECF No. 27, ¶ e.) (SAC, ECF No. 26 at 2:5-9, 13-14, 24-25.)  Plaintiff arrived at CSP on April 1, 2015 and was placed into the Security Housing Unit.  (DUF #8; Deft's Exhibit A, ECF No. 51-4 at 6 (DX-A 005) – Plaintiff's movement summary.) (SAC at 7:18-19.)  On May 5, 2015, an ICC[8] hearing was held at CSP, which Plaintiff did not attend.[9]  (DUF #9, 13; DX A at 2:25-26, 3:9-10.) (SAC at 7:26-28, 8:7-8.)  Defendant Mascarenas appeared at the hearing and presented information about plaintiff to the committee members, via a Form 128-G chrono.  (DUF # 11, 12.) (SAC at 8:12-15, 9:3-9.)  A decision was made that Plaintiff would remain on single cell status until his housing cell status could be further reviewed, and he could be returned to the ICC to address his cell placement.  (DUF #18.).

Defendant Mascarenas declared, "I was the CCI who presented information for inmate Timberland's Initial SHU Classification Committee hearing held on May 5, 2015." (Mascarenas Declaration, Exh. B, ¶ 8.)

On the Form 128-G, Counselor Mascarenas noted under "Committee Comments" that Timberland "was housed on a Sensitive Needs Yard (SNY) facility from 2002 to 2005. DUF #14.)

---

[8] Institutional Classification Committee.

[9] The parties dispute whether Plaintiff was notified about the hearing ahead of time and refused to attend. (DUF #9.)  This is not a material dispute of fact.  The relevant fact is that Plaintiff did not attend the hearing, which is not in dispute.

The 128-G chrono stated as follows.

"ICC notes S was SNY status prior to parole.  Upon review of SOMS, S was housed on an SNY from 2002-2005.  Per 128-B 3-11-15, S States he is G.P. and his safety issues were exclusive to HDSP.  ICC action dated 3-11-15 does not address prior SNY placement and there is no current documentation since current term documenting is still requesting SNY placement.  ICC elects to place S on single cell status pending cell-review and to return to ICC to address cell placement."

(DUF, ECF. No. 51-4, Exh. A at 23-24, DX-A 25-26; Classification Committee chrono dated 5-5-15, heading: cell review.)  (ECF No. 76, Exh. B at 31-32; see pg. 28 (B) – Plaintiff identifies this Classification Committee Chrono as the 128-G at issue.)

Plaintiff presents no admissible evidence that defendant Mascarenas purposely submitted false information to the committee, and Defendant denies that she did.

"The information in the 128-G regarding inmate Timberland's history on the SNY is accurate information that I obtained from his Central File."

(DUF #15; Mascarenas Declaration, Exh. B, ECF No. 51-5 at 3 ¶ 8.)

The parties dispute whether Counselor Mascarenas gave a copy of Plaintiff's 128-G chrono to another inmate, which Plaintiff alleges placed him at risk of harm.  Plaintiff has no admissible evidence that identifies Counselor Mascarenas as the person Plaintiff alleges gave a copy Plaintiff's 128-G chrono to another inmate.  In fact, there is no evidence that Defendant gave a copy of the 128-G to Plaintiff or any other inmate.  Defendant declares:

"During my time as a Correctional Counselor I in the Security Housing Unit, it was my custom and practice to provide an inmate with a copy of the CDCR Form 128-G if it was requested by the inmate."  (Mascarenas Decl., ECF No. 51-5 ¶ 12.)  It was not my practice to send the inmate's 128-G through institutional mail."  (Id. ¶ 13.)  "I did not receive a request [from] inmate Timberland for a copy of his 128-G, and therefore, as was my practice, I did not provide inmate

///

Timberland with a copy [of] that document." (Id. ¶ 16.) I did not give any other inmate a copy of inmate Timberland's 128-G. (Id. ¶ 17.)

Plaintiff declared that Officer Tavarez, the officer who gave Plaintiff the envelope containing Plaintiff's 128-G form, only identified the person who gave Plaintiff's document to another inmate as a "counselor."

"On May 11, 2015, 4B4R, 3rd Watch Unit 'Floor' Officer Tavarez, while passing out inmate mail, stopped in front of my cell door #01, and slid an envelope under my cell door, stating, 'Hey the guy in #10 gave this to me.' He said **one of the counselors** gave it to him last week. Officer Tabarez then walked away. I opened the envelope, which had my name and cell number on it, and started reading the enclosed document. I realized that this was a '128-G' – 'Classification Committee Chrono' (C.C.C.), which is received after attending an Institution Classification Committee Hearing. (I.C.C.H.)" (Plaintiff's Decl. ECF No. 76 at 58.)

Plaintiff asserts that the inmate in cell #10, who said an individual had given him Plaintiff's mail, only identified the person as a "female counselor."

"On June 1, 2015 plaintiff contacted the black inmate residing in cell #10, known to myself as 'Baby Boy,' a validated gang member, asking him exactly when he had received the document (C.C.C.) containing information about the Initial ICC Hearing held on May 5, 2015. He responded, 'Look here dude, **some female counselor** shot this under my door a week or so ago. She told me that I should probably pass this around. . . Hey, I won't lie I read it and was like wow. Sorry man – you know I had to shoot that to your people. If that's true – you shouldn't be snitchin' on folks, you know?'" (Pltf's Decl., ECF No. 76 at 62.) Thus, according to Plaintiff's declaration, "Baby Boy" identified the counselor as a **female counselor,** but importantly did not identify her as defendant Mascarenas.

Plaintiff admitted in his deposition that there was more than one female counselor at CSP and that he had never met defendant Mascarenas. (DUF #27, DX C at 39:16-20.)

In his opposition to the motion for summary judgment, Plaintiff claims that he had declarations from the following: 2nd and 3rd watch Floor Officers Tabarez, Aldaco, and the

Town officer Malin, as well as the inmate known as "Baby Boy," whom all identified defendant Mascarenas as the counselor who gave the 128-G to the inmate residing in cell 110, Baby Boy. However, during one of his many transfers since being released from the SHU on April 26, 2017, the box of property that contained the declarations, as well as other legal documents were lost in transit. Plaintiff claims that he has been unable to obtain information as to where these officers are now employed, and information about whether Baby Boy is still an inmate and where he can be located. (ECF No. 76 at 12:5-13.)

Plaintiff now claims that because Defendant Mascarenas' name was on the chrono, he assumed that she was the Counselor who gave the 128-G to another inmate. (DUF #28, DX C. at 39:4-7.)

In sum, Plaintiff provides only speculation and hearsay evidence in support of his argument that defendant Mascarenas personally participated in the alleged conduct that placed Plaintiff at risk of harm. There is no admissible evidence that defendant Mascarenas was the person who intentionally placed allegedly false information on Plaintiff's 128-G form, or gave Plaintiff's 128-G form to another inmate with instructions to pass it around.

### C.    Aware of a Substantial Risk of Serious Harm

A prison official does not act in a deliberately indifferent manner unless the official "*knows of* and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 834 (1994) (emphasis added). The "official must both *be aware of facts* from which the inference could be drawn that a substantial risk of serious harm exists, and *he must also draw that inference*." Id. at 837 (emphasis added).

Plaintiff recognized the significance of the information on the 128-G stating that he had been a SNY inmate:

> "I quickly understood that the fraudulent information this document contained about myself could/would cause a potentially dangerous situation to be put forth among the inmate population and my standing or reputation with them. This proved to be insanely true as the days and months progressed."

(Pltf's Decl., ECF No. 76 at 59.)

Plaintiff alleges that it was common knowledge among inmates and staff members alike that General Population inmates viewed SNY inmates, formerly known as "PC's" (Protective Custody) as child molesters, rapists, snitches, or rats, inmate cops and as such they targeted SNY inmates for assault and/or death, (ECF No. 76 at 14:1-6), and Defendant admitted, "The General Population inmates and inmates on the SNY are kept separated for the safety and security of the institution." (Deft's response to Pltf's Request for Admission #1.) However, Plaintiff provides no evidence that Defendant Mascarenas was aware that he was at risk of harm because his 128-G chrono had been shared with another inmate.

**D.      Acted Unreasonably or With Deliberate Indifference**

To act with deliberate indifference, a prison official must subjectively "know of and disregard an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837; Anderson, 45 F.3d at 1313. Conversely, an official who knows of a substantial risk of harm to an inmate's health or safety but acts reasonably under the circumstances will not be held liable under the cruel and unusual punishment clause, even if the threatened harm results. See Farmer, 511 U.S. at 843.

**Discussion**

There is no evidence that Defendant Mascarenas possessed the state of mind necessary to support a claim for deliberate indifference. Plaintiff has admitted that he never met defendant Mascarenas, (DUF #27, DX C, Deposition, ECF No. 51-6 at 3:11-13); that he only assumed that defendant Mascarenas had a problem with him because of what he speculated that defendant Mascarenas had done, (Id. at 5:8-11); and that he thought defendant Mascarenas was the counselor who acted against him because "[s]he's the one whose signature or whose name is set on the 128-G (Id. at 5:4-7).

There is also no indication in defendant Mascarenas' description of her duties, customs, and practices in performing her job that she harbored any feelings against Plaintiff or had any reason to disregard a known excessive risk of harm to Plaintiff. (Mascarenas Decl., ECF No. 51-5 ¶ 12, 13, 16, 17.)

///

31

Thus, Plaintiff has not presented any evidence that defendant Mascarenas acted unreasonably or with deliberate indifference against him.

### E. Caused Harm

To state a deliberate indifference claim, a causal relationship between Defendants' acts and Plaintiff's alleged damages must be shown. Based on the foregoing conclusions that Plaintiff has not proven that Defendant personally acted against him, knew that he was at risk of harm, or acted with deliberate indifference against him, the court finds no evidence that Defendant caused harm to Plaintiff.

## X. QUALIFIED IMMUNITY

Defendant argues that she is entitled to immunity for any of her conduct found to violate Plaintiff's rights in this case. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Taylor v. Barkes, 575 U.S. 822, ---, 135 S.Ct. 2042, 2044 (June 1, 2015) quoting Reichle v. Howards, 566 U. S. 658, 132 S.Ct. 2088, 2093 (2012). Qualified immunity analysis requires two prongs of inquiry: "(1) whether 'the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established' as of the date of the involved events 'in light of the specific context of the case.'" Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) quoting Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009).

As discussed above, the court has found that Defendant did not violate Plaintiff's constitutional rights and that Defendant is entitled to summary judgment. Therefore, the issue of qualified immunity shall not be addressed.

## XI. CONCLUSION AND RECOMMENDATIONS

Defendant has submitted evidence that she did not act with deliberate indifference against Plaintiff in violation of the Eighth Amendment, and Plaintiff has not produced admissible evidence in response that creates a disputed issue of material fact. Accordingly, defendant Mascarenas is entitled to judgment on Plaintiff's Eighth Amendment claim against her, and Defendant's motion for summary judgment, filed on January 6, 2020, should be granted.

Therefore, **IT IS HEREBY RECOMMENDED that:**

1.      Defendant's motion for summary judgment, filed on January 6, 2020, be **GRANTED;** and

2.      Summary judgment be entered in favor of Defendant, closing this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). **Within fourteen (14) days** from the date of service of these findings and recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed **within ten (10) days** after the date the objections are filed. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:    **December 16, 2020**              **/s/ Gary S. Austin**

                                            UNITED STATES MAGISTRATE JUDGE